1
2
3
4
5

Michael Jay Leizerman *(Pro Hac Vice)*
Rena Mara Leizerman *(Pro Hac Vice)*
The Law Firm For Truck Safety, LLP
3450 W. Central Avenue, Suite 328
Toledo, OH 43606
Phone: (800) 628-4500
Facsimile: (888) 838-8828
Email: michael@truckaccidents.com
         rena@truckaccidents.com

Matthew L. Sharp
Nevada State Bar 4746
Law Office of Matthew L. Sharp
432 Ridge Street
Reno, NV 89501
Phone: (775) 324-1500
Facsimile: (775) 284-0675
Email: matt@mattsharplaw.com

*Attorneys for Plaintiff Allen M. Miller*

6
7
8
9
10
11

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

12
13
14
15
16
17
18
19
20

| | |
|---|---|
| ALLEN M. MILLER, | Case No.: 3:17-cv-00408-MMD-WCG |
| Plaintiff, | |
| v. | |
| C.H. ROBINSON WORLDWIDE, INC., RONEL R. SINGH, RHEAS TRANS, INC., And KUWAR SINGH dba RT SERVICE, | **PLAINTIFF'S RESPONSE TO C.H. ROBINSON WORLDWIDE, INC.'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 124)** |
| Defendants. | |

21
22
23
24
25
26
27
28

Plaintiff Allen Michael Miller, through undersigned counsel, files this response to Defendant C.H. Robinson Worldwide, Inc.'s ("CHR") Motion for Summary Judgment. Plaintiff bases this response on the attached Memorandum of Points and Authorities, Declaration, and Exhibits.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.    DISPUTED MATERIAL FACTS ........................................................................ 1
      A.  Rheas Trans, Inc. ("Rheas Trans") ........................................................... 2
      B.  Rheas Trans Reincarnation to RT Service ............................................... 3
      C.  CHR's Hiring of RT Service ..................................................................... 4
      D.  CHR's Retention of RT Service ................................................................ 6
      E.  CHR's Contract Addendum and Load Confirmation with RT Service ............ 7
      F.  Collision Between RT Service and Allen Miller ....................................... 8
      G.  RT Service's Unsafe Driving: Too Fast for Conditions ............................. 8
      H.  RT Service's Unsafe Driving: Fatigue ...................................................... 10

II.   STANDARD OF REVIEW AND GOVERNING LAW .................................... 11

III.  THERE ARE JURY QUESTIONS ABOUT NEGLIGENT SELECTION. .................. 11

      A.  Sworn evidence raises genuine issues of material fact about the standard of care. ....... 11
          1.  The FMCSRs do not preempt negligent hiring claims. ................................. 12
          2.  Neither the FMCSA nor the FMCSRs impose exclusive duties. ......................... 13
          3.  This is a classic battle of experts regarding industry standards and breach. ............. 15
          4.  CHR's FAST Act argument is a red herring. ..................................................... 17
      B.  There are genuine issues of material fact about proximate cause. ............................ 20

IV.   VICARIOUS LIABILITY IS A LIVE ISSUE. ................................................. 23
      A.  Dismissal of the vicarious liability claim does not foreclose the theory at trial. .......... 23
      B.  Dismissal and release of the Settling Defendants do not foreclose vicarious liability. . 23
      C.  Defendant CHR cannot satisfy its burden on summary judgment. ............................... 25
      D.  Even if it had satisfied its burden, there are genuine issues of material fact. ................ 26

CONCLUSION ................................................................................................................ 30

i

## TABLE OF AUTHORITIES

**Cases**

*Amalu v. Stephens Transp., Inc.*,
  2018 WL 6829044 (W.D. Tenn. Mar. 12, 2018)...................................................................18
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................................................11
*Beavers v. Victorian*,
  38 F.Supp.3d 1260 (W.D. Okla. 2014) ..............................................................................14
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................................................11
*Ciotola v. Star Transp. & Trucking, LLC*,
  481 F. Supp. 3d 375 (M.D. Pa. 2020) ...............................................................................26
*De Blanc v. Aloha Airport Exp., LLC*,
  416 F. Supp. 3d 1056 (D. Nev. 2019) ...............................................................................25
*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938) .............................................................................................................11
*Garcia v. Nevada Prop. 1, LLC*,
  2015 WL 67019 (D. Nev. Jan. 6, 2015) .............................................................................23
*Grand Hotel Gift Shop v. Granite State Ins. Co.*,
  839 P.2d 599 (Nev. 1992) ..................................................................................................26
*Havas v. Hughes Estate*,
  643 P.2d 1220 (Nev. 1982) ................................................................................................15
*Herring-Hall-Marvin Safe Co v. Balliet*,
  145 P. 941 (Nev. 1915) ......................................................................................................26
*Hill v. Keolis Transit Servs., LLC*,
  2018 WL 2398379 (Nev. Dist. Ct. May 9, 2018).............................................................25
*Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 AFL–CIO v. Martin Jaska, Inc.*,
  752 F.2d 1401 (9th Cir.1985).............................................................................................25
*Jones v. CHR*,
  558 F.Supp.2d 630 (W.D. Va. 2008)............................................................................14, 21
*Joynt v. California Hotel & Casino*,
  835 P.2d 799 (Nev. 1992) ..................................................................................................20
*Kaiser Cement Corp. v. Fischbach & Moore, Inc.*,
  793 F.2d 1100 (9th Cir. 1986) ...........................................................................................11
*Keystone Realty v. Osterhus*,
  807 P2d 1385 (Nev. 1991) .................................................................................................26
*Mann v. C.H. Robinson Worldwide, Inc.*,
  2017 WL 3191516 (W.D. Va. Ju. 27, 2017) .....................................................................18
*Mansoor v. Am. Med. Sys., Inc.*,
  2009 WL 10693229 (D. Nev. Sept. 18, 2009) ...................................................................26
*McComb v. Bugarin*,
  20 F. Supp. 3d 676 (N.D. Ill. Sept. 18, 2009) ...................................................................22
*McCrosky v. Carson Tahoe Reg. Med. Ctr.*,
  408 P.3d 149 (Nev. 2017) ..................................................................................................25
*Morgan v. Wal-Mart Stores, Inc.*,
  2019 WL 1386376 (D. Nev. March 26, 2019) ...................................................................20
*N. Carolina Motorcoach Ass'n v. Guilford Cty. Bd. Of Ed.*,
  315 F. Supp.2d 784 (M.D.N.C. 2004)...........................................................................13, 14
*N. Nev. Mobile Home Brokers v. Penrod*,
  610 P.2d 724 (Nev. 1980) ..................................................................................................26
*O'Dell v. Universal Credit Co.*,
  191 S.E. 568 (W. Va. 1937) ...............................................................................................24
*Ramos-Becerra v. Hatfield*,
  2016 WL 5719801 (M.D. Pa. Oct. 3, 2016) ................................................................12, 14

ii

*Ramos-Becerra v. Hatfield*,
  2016 WL 4127387 (M.D. Pa. Aug. 3, 2016) ............................................................ 12
*Riley v. A.K. Logistics, Inc.*,
  2017 WL 2501138 (E.D. Mo. June 9, 2017) ...................................................... Passim
*Russ v. Gen. Motors Corp.*,
  906 P.2d 718 (Nev. 1995) ...................................................................................... 25
*Schramm v. Foster*,
  341 F. Supp. 2d 536 (D. Md. 2004) ................................................................ 12, 13
*Scott v. Milosevic*,
  372 F. Supp. 3d 758 (N.D. Iowa 2019) ............................................................ 14, 15
*Sheet Metal Workers' Int'l Ass'n Local No. 355 v. N.L.R.B.*,
  716 F.2d 1249 (9th Cir. 1983) .............................................................................. 26
*Skowron v. C.H. Robinson Worldwide, Inc.*,
  2020 WL 4736070 (D. Mass. Aug. 14, 2020) ........................................................ 14
*Specialized Carriers & Rigging Ass'n v. Virginia*,
  795 F.2d 1152 (4th Cir. 1986) .............................................................................. 13
*Steely v. Gen. Motors Corp.*,
  1986 WL 14395 (D. Nev. Dec. 2, 1986) ................................................................ 25
*Turner v. Syfan Logistics, Inc.*,
  2016 WL 1559176 (W.D. Va. 2016) ...................................................................... 18
*Van Cleave v. Gamboni Const. Co.*,
  706 P.2d 845 (Nev. 1985) ...................................................................................... 24
*Verrastro v. Bay Hospitalists, LLC*,
  208 A.3d 720 (Del. 2019) ...................................................................................... 25
*Volkova v. C.H. Robinson Worldwide, Inc.*,
  2018 WL 741441 (N.D. Ill. Feb. 7, 2018) .............................................................. 30
  2019 WL 2436903 (N.D. Ill. May 16, 2019) .......................................................... 30
  2019 WL 4461714 (N.D. Ill. May 16, 2019) .......................................................... 30
*Woodrum v. Johnson*,
  559 S.E.2d 908 (W. Va. 2001) .............................................................................. 24
*Ying Ye v Glob. Sunrise, Inc*,
  2020 WL 1042047 (N.D. Ill. Mar. 4, 2020) ...................................................... 26, 28

## Statutes

49 U.S.C. § 521(b)(5)(B) ......................................................................................... 3
49 U.S.C. § 13902 (a)(1)(A) ................................................................................... 13
49 U.S.C. § 31136(a) ............................................................................................. 12
49 U.S.C. § 31136(a)(1) ......................................................................................... 12
Nev. Rev. Stat. § 17.245 ......................................................................................... 23
Nev. Rev. Stat. § 17.245(1) ..................................................................................... 24
Fixing America's Surface Transportation Act, Pub. L. No. 114-94, 129 Stat. 1312 (2015) ........... 17, 18, 19
Motor Carrier Act, Pub. L. No. 96-1069, 1980 U.S.C.C.A.N. 2283 .......................................... 2

## Rules

Fed. R. Evid. 411 ................................................................................................... 27
Fed. R. Evid. 801(d) ................................................................................................. 2

## Regulations

49 C.F.R. Part 395 ................................................................................................... 3
49 C.F.R. § 383.111(12) ........................................................................................... 9
49 C.F.R. § 383.113(7) ............................................................................................. 9
49 C.F.R. § 385, Appendix B ..................................................................................... 4
49 C.F.R. § 385.13 ................................................................................................. 12

iii

49 C.F.R. § 385.1003 ....................................................................................................4
49 C.F.R. § 385.1005 ....................................................................................................4
49 C.F.R. § 385.1007(b) ...............................................................................................4
49 C.F.R. § 387.9 ..........................................................................................................2
49 C.F.R. § 387.33 ......................................................................................................13
49 C.F.R. § 391.1 ........................................................................................................12
49 C.F.R. § 392 ...........................................................................................................12
49 C.F.R. § 392.1 ..........................................................................................................9
49 C.F.R. § 392.9a ......................................................................................................12
49 C.F.R. § 392.14 ........................................................................................................9

**Other Authority/Links**

https://www.azrockproducts.org/wp-content/uploads/April-1-2016_OOSC_U.S._Blue_
     Paper.pdf ........................................................................................................... 3, 10
https://s21.q4cdn.com/950981335/files/doc_financials/2020/ar/CHRW-2020-Annual-Report-10-
     K.pdf ....................................................................................................................... 1
https://int.chrobinson.com/en-gb/chrobinsonusa/logistics/truckload ......................... 2, 13
https://www.chrobinson.com/en-us/shippers/freight-shipping/ ...................................... 2
https://www.chrobinson.com /en-us/resources/resource-center /videos /navisphere-technology-
     platform/ .................................................................................................................... 5
https://csa.fmcsa.dot.gov/ ................................................................................................ 8
https://csa.fmcsa.dot.gov /documents/smsmethodology.pdf ....................................... 19
https://csa.fmcsa.dot.gov/Documents/Safety_Ratings_Factsheet_GRS_M.PDF ......... 19
https://csa.fmcsa.dot.gov/WhatsNew/Article?articleId=30184 ................................... 18
https://dmvnv.com/pdfforms/dlbookcomm.pdf ............................................................. 9
https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/MINIMUM%20INSURANCE%20IS
     %20A%20SAFETY%20ISSUE%20%28291151%29.pdf .......................................... 2
https://www.fmcsa.dot.gov/newsroom/fmcsa-restores-property-carriers-absolute-measures-
     compliance-fast-act. ................................................................................................ 19
https://www.gao.gov/assets/gao-09-924.pdf. ................................................................. 4
https://www.gao.gov/assets/gao-12-364.pdf. ......................................................... 2, 4, 13
https://safer.fmcsa.dot.gov/ ........................................................................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant C.H. Robinson ("CHR") argues that the Court should grant summary judgment because CHR hired RT Service, not their driver Ronel Singh. As a threshold matter, Ronel Singh managed and was responsible for all of RT Service's operations. He was driving for RT Service when he drove too fast for the inclement weather, lost control of his tractor-trailer, and blocked the roadway. Plaintiff Allen Miller could not avoid colliding with the tractor-trailer and has quadriplegia due to the collision.

But this case is not just about Mr. Singh. It also is about how CHR hired a motor carrier that (i) was a chameleon carrier, (ii) had a history of lapsed insurance, ongoing safety violations, and no safety rating, (iii) put a driver behind the wheel with no working knowledge of the applicable federal safety regulations and a history of speeding in inclement weather, hours-of-service violations, and false logbooks, and (iv) used a tractor-trailer that was illegal to be on the road.

Investigating that issue uncovered substantial sworn testimony from which a reasonable juror could conclude that Defendant CHR negligently hired and retained RT Service and CHR's negligence was a proximate cause of the collision. The Court should deny CHR's Motion because there are genuine issues of material fact about the applicable standard of care, whether CHR knew or should have known about RT Service's incompetence, and whether it was reasonably foreseeable that RT Service's incompetence would cause the collision. In addition, there are jury questions about whether CHR is vicariously liable for RT Service and Ronel Singh's negligence.

## I.   DISPUTED MATERIAL FACTS

1.    CHR is a licensed freight broker. It provides, among other things, freight transportation and logistics services, including hiring motor carriers to transport freight for CHR's customers.[1]

---

[1]    https://s21.q4cdn.com/950981335/files/doc_financials/2020/ar/CHRW-2020-Annual-Report-10-K.pdf (Part I).

2.     CHR advertises that it has developed the "largest pool of vetted, reliable, high-quality carriers in North America." They tell their shipper customers: "we've got you covered, start to finish."[2]

3.     Bruce Johnson, CHR's Rule 30(b)(6) corporate representative, agrees that a "broker has a duty to use reasonable care when selecting a trucking company to haul loads," it is "part of CHR's obligation [] to hire safe trucking companies," and "driving a tractor-trailer involves a risk of physical harm unless it is skillfully and carefully done."[3]

### A. Rheas Trans, Inc. ("Rheas Trans")

4.     CHR admits that it contracted with motor carrier Rheas Trans in 2013 and did not remove the company from its database until 2017.[4]

5.     Rheas Trans lists Ronel Singh as the company's president.[5]

6.     The Federal Motor Carrier Safety Administration (the "FMCSA") revoked Rheas Trans's registration for failure to maintain the minimum required insurance twice in 2013 and a third time in January 2014.[6] There is a strong correlation between maintaining truck liability insurance and safety to members of the motoring public like Plaintiff Allen Miller.[7]

---

[2] https://int.chrobinson.com/en-gb/chrobinsonusa/logistics/truckload; https://www.chrobinson.com/en-us/shippers/freight-shipping/.

[3] CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. from *Gilley v. CHR*, No. 1:18-CV-00536 (S.D. W. Va. Feb. 12, 2020) at 64:15-20. **Ex. A**; *see also* Fed. R. Evid. 801(d) (Admission of a Party-Opponent).

[4] CHR's Response to First Set of Interrogatories from Plaintiff No. 4 at 6. **Ex. B.**

[5] *See* Rheas Trans OP-1 Application. **Ex. C.**

[6] Dr. Thomas Corsi Affidavit (Attachment 1 at 9, ¶ 20). **Ex. D.** The FMCSRs require motor carriers like Rheas Trans to maintain a minimum level ($750,000) of liability insurance. 49 C.F.R. § 387.9.

[7] FMCSA, *Minimum Truck Liability Insurance is a Safety Issue,* https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/MINIMUM%20INSURANCE%20IS%20A%20SAFETY%20ISSUE%20%28291151%29.pdf (last visited July 19, 2021). "The issue of financial responsibility… is inextricably bound to the entry provision of the legislation that directly concern the 'fitness' of the carrier to operate in interstate commerce." H.R. No. 96-1069 at 9, 1980 U.S.C.C.A.N. 2283. Congress designed the minimum level of insurance to bar entry to those "who might have little concern for the safer operation and maintenance of their vehicles, thereby posing a threat to those who share the highways with them." *Id.* at 6. And Congress sought to incentivize insurance companies to conduct on-site inspection of motor carriers to supplement insufficient government oversight of the industry. *Id.* at 43. In 1980—when Congress adopted the minimum insurance requirement—the federal government could not provide sufficient oversight to a growing trucking industry. With the number of motor carriers skyrocketing over the past four decades, the FMCSA still "does not have the resources to vet all new carriers." https://www.gao.gov/assets/gao-12-364.pdf.

7.      Between June 2011 and January 2014, Rheas Trans received approximately 40 roadside inspections. The FMCSA placed Rheas Trans out-of-service[8] in 15 of these inspections; 8 were driver-related, 7 were vehicle-related. Nine of the individual driver-related violations were for violating the hours-of-service regulations, [9] including 3 false logbook violations.[10]

8.      After revoking Rheas Trans's registration on January 21, 2014, the FMCSA never reinstated it.[11] Ronel Singh, the owner and president of Rheas Trans, filed for Chapter 7 bankruptcy on January 28, 2014.[12]

### B. Rheas Trans Reincarnation[13] to RT Service

9.      On January 8, 2014, Rheas Trans president Ronel Singh applied for RT Service to obtain federal registration in his father's name (Kuwar Singh).[14]

10.      Ronel Singh's father, Kuwar Singh, was not involved in the business or management of RT Service. Kuwar Singh has never driven a truck and does not have a Commercial Driver's License.

---

[8] A violation is "out-of-service" when it poses an "imminent hazard" to public safety. "Imminent hazard" is "any condition . . likely to result in serious injury or death." 49 U.S.C. § 521(b)(5)(B). An out-of-service order forces the driver and vehicle off the road until the resolution of the issue. Motor carriers receive points for out-of-service violations. The FMCSA publishes every motor carrier's points and violations on its public website, updating out-of-service rates on a monthly basis. *See* https://csa.fmcsa.dot.gov/.

[9] The hours-of-service regulations (49 C.F.R. Part 395) attempt to keep fatigued drivers off public roadways. They limit when and how long a driver may be on the road. A violation of the hours-of-service regulations often results in an out-of-service order. A carrier with multiple hours-of-service violations suggests that the carrier has a history of putting fatigued drivers on the road. The hours-of-service regulations also require drivers to record their hours in a logbook; a falsified logbook is "an apparent attempt to conceal a violation of the regulations." https://www.azrockproducts.org/wp-content/uploads/April-1-2016_OOSC_U.S._Blue_Paper.pdf (2016) (North American Standard Out-of-Service Criteria for certified government inspectors of large trucks and buses at 7). After this collision, the FMCSA replaced the paper logbook requirement with an Electronic Logbook Device (ELD) requirement to minimize falsification.

[10] All of this data is publicly available on the FMCSA website. *See infra* footnote 99 and accompanying text. Freedom of Information Act (FOIA) requests to the FMCSA verified the data for purposes of this litigation because the FMCSA website removes inspection and citation data after 24 months. But Plaintiff does not contend that a reasonable broker must make a FOIA request for every contracted carrier. Rather, almost all of the data was freely accessible on the public FMCSA website in 2014.

[11] *Id.* at 10, ¶ 24. **Ex. D.**

[12] *See* Bankruptcy Petition, Case No. 14-20770 (Bankr. E.D. Cal.). **Ex. E.**

[13] For an explanation of reincarnated ("chameleon") carriers, *see infra* footnote 19.

[14] *See* RT Service OP-1 Application. **Ex. F.**

He does not speak English, and his only role at the company was cleaning trucks. Ronel Singh had full responsibility for the business operations of RT Service.[15]

### C.  CHR's Hiring of RT Service

11.     CHR uses the FMCSA website to verify the carrier's registration, insurance, and safety rating. CHR will not hire carriers with an Unsatisfactory or Conditional safety rating, but it hires carriers with no safety rating ("Unrated").[16]  CHR does no additional investigation of Unrated carriers.[17] CHR does not look at out-of-service driver rates and violations or any other safety fitness data on the FMCSA website or elsewhere. Nor does it ask Unrated carriers about their safety management controls in critical areas.[18]

12.     CHR corporate representative Bruce Johnson testified that CHR's policy—when the company suspects that a carrier is a "chameleon"[19] —is to refer the matter to its internal Carrier Services Group for further investigation. He admitted that a matching address, telephone number,

---

[15] Ronel Singh Dep. 27:13-28:5. **Ex. G**; Dr. Thomas Corsi Affidavit (Attachment 1 at 7, ¶ 17). **Ex. D.**

[16] CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. 26: 1-18. **Ex. A.** After a compliance review, the FMCSA issues one of three safety ratings to carriers: **Satisfactory, Conditional, or Unsatisfactory**. **Satisfactory** means that the carrier has the minimum safety minimum controls. **Conditional** means the carrier's safety measures were insufficient, but it has not yet violated the safety fitness standard; the FMCSA requires a corrective action plan. **Unsatisfactory** means that the carrier's safety measures were insufficient, and it violated the safety fitness standard; the carrier can no longer operate in interstate commerce. **Unrated** means the FMCSA has not assigned a Safety Rating yet. *See* 49 C.F.R. § 385, Appendix B.

[17] *Id.* at 28:1-5. **Ex. A.**

[18] *Id.* at 67:24-69:7. **Ex. A.**

[19] A "chameleon" (also described as "reincarnated") carrier evades FMCSA fines, regulations, poor safety ratings, and registration revocations, by shutting down and reincarnating as a "new" company. *See Reincarnating Commercial Vehicle Companies Pose Safety Threat to Motoring Public* (2009), https://www.gao.gov/assets/gao-09-924.pdf. Like the chameleon that changes color but not shape, chameleon carriers reincarnate or re-brand with the same ownership, assets, or drivers but do not change their culture or unsafe practices. The trucking industry is well aware of this danger. A chameleon carrier is three times more likely to cause a roadway injury or death than ordinary carriers. https://www.gao.gov/products/gao-12-364. Chameleon attributes include "common ownership, common management, common control or common familial relationship." 49 C.F.R. §§ 385.1003, 385.1005, and 395.1007(b). Red flags for chameleon-carrier detection include "registration information that matched information for a previously registered carrier" or the "previously registered carrier had a motive for evading detection," such as a "history of safety violations" or "bankruptcy that might motivate a carrier to become a chameleon carrier." https://www.gao.gov/products/gao-12-364 at 17.

or contract signer between two or more carriers in CHR's database should trigger a referral to their Carrier Services Group.[20]

13.     CHR's "Carrier Sign-Up Form" for RT Service states that the "point of contact" is "Ron Singh, Seema Singh, Kuwar Singh."[21]

14.     CHR uses Navisphere®, a cloud-based technology platform for transportation management, to database their network of motor carriers.[22]   In CHR's Navisphere® database:

- RT Service's profile page lists "Rheas Trans Inc., Kuwar Singh, and Ronel Singh" as "Related Parties."

- RT Service's profile also lists "Rheas Trans Inc." as the parent corporation and lists Kuwar Singh as "Family" and "Parent."

- The profiles for RT Service and Rheas Trans use the same e-mail address and the same two telephone numbers.[23]

15.     CHR entered into a contract with RT Service—an Unrated carrier—on February 4, 2014, less than a month after Ronel Singh filed for bankruptcy (January 28, 2014), the FMCSA revoked Rheas Trans's registration (January 21, 2014), and RT Service filed for registration (January 8, 2014).[24]

16.     Despite the matching and related information for the two carriers in CHR's database, Defendant CHR never referred the matter to its internal Carrier Services Group or otherwise investigated when it entered into a contract with RT Service.

17.     A "very brief telephone interview" with Ronel Singh would have revealed his lack of knowledge about basic safety.[25] Mr. Singh did not understand commercial motor vehicle brake systems, did not have a systematic method for vehicle maintenance or any safety manuals, driver's

---

[20] CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. at 28:15- 29:10. **Ex. A.**

[21] **Ex. I.** Seema is Ronel Singh's wife and Kuwar is his father.

[22] CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. at 29:19-23. **Ex. A**; *see also* https://www.chrobinson.com/en-us/resources/resource-center /videos /navisphere-technology-platform/.

[23] *See* Navisphere® database screenshots. **Ex. J**

[24] CHR-RT Service Master Broker-Carrier Contract. **Ex. K**; *see also* Disputed Material Facts ¶¶ 8-9.

[25] Steven Belyus Affidavit (Attachment 1 at 7). **Ex. L**

handbooks, or written policies, and did not understand the rest break requirements for hours-of-service compliance, among other things.[26]

18.     An insurance underwriter refused to insure RT Service because the underwriter suspected RT Service was a "chameleon carrier."[27]

### D.  CHR's Retention of RT Service

19.     Between January 2014 and October 2016, RT Service had 37 roadside inspections. The FMCSA placed RT Service out-of-service[28] for 14 of them. RT Service's out-of-service driver rate was twice the national average; their out-of-service vehicle rate was more than 170% of the national average.[29]

20.     On October 4, 2016, approximately two months before the collision, the FMCSA revoked RT Service's registration for failure to maintain the minimum required insurance.[30]

21.     CHR requires its contracted carriers to provide current insurance certificates. RT Service submitted at least 5 new certificates to CHR in 2016. The new certificates suggest that RT Service could not afford to pay the insurance premiums or was unwilling to comply with the FMCSRs.[31] Notwithstanding the direct correlation between insurance and safety in the trucking industry,[32] this raised no red flags for CHR to investigate further.[33]

---

[26] *Id.* (citing Ronel Singh's deposition testimony). **Ex. L**; Dr. Thomas Corsi Affidavit (Attachment 1 at 17, ¶ 32) (same). **Ex. D.**

[27] *See* Noble West Marketing Worksheet ("Declined: Suspected of being a chameleon carrier). **Ex. M.**

[28] For the definition of out-of-service, *see* footnote 8.

[29] Dr. Thomas Corsi Affidavit (Attachment 1 at 12, ¶¶ 25-26) **Ex. D**; *see also* Steve Belyus Affidavit (Attachment 1 at 6). **Ex. L.** All of this data was publicly available on the FMCSA website. *See infra* footnote 99 and accompanying text.

[30] Steven Belyus Affidavit (Attachment 1 at 5). **Ex. L.** The FMCSA reinstated RT Service's registration on October 11, 2016. For the strong correlation between maintaining the minimum insurance and public safety in the trucking industry, *see supra* footnote 7.

[31] Steve Belyus Affidavit (Attachment 1 at 7). **Ex. L**; CHR Representative (Bruce Johnson) Rule 30(b)(6) Dep. Tr. at 34:3-35:6. **Ex. A.**

[32] *See supra* footnote 7.

[33] CHR Representative (Bruce Johnson) Rule 30(b)(6) Dep. Tr. at 41:4-10. **Ex. A.**

22.     Ronel Singh's driving record for the two years before this collision includes convictions for speeding in inclement weather (2015) and speeding in a commercial motor vehicle (2014).[34]

23.     Dr. Thomas Corsi, an expert in transportation and logistics, attested:

- "There is a 'chain of causation for this collision involving Defendant [CHR]" and "[h]ad reasonable care been taken," CHR "would have examined the safety performance record and safety management practices of RT Service/Rheas Trans [] and not brokered the load" to them.[35]

- "Mr. [Ronel] Singh initiated a request for a new motor carrier number and authority [] to separate his trucking operations from the abysmal safety record compiled under the [USDOT number] of Rheas Trans, Inc. However, the operation of RT Service by Mr. Singh has fared no better in safety management programs [] and records than did his operation of Rheas Trans, Inc. ** [T]he safety management policies along with the actual safety record of both companies have demonstrated significant deficiencies and have resulted in an enhanced likelihood of higher crash rates than would occur if the carriers had a better safety record."[36]

- "In my opinion, CH Robinson Worldwide, Inc. violated a reasonable standard of care in ignoring publicly available and highly unsatisfactory safety performance data about Mr. Singh's trucking company (Rheas Trans, Inc./RT Service) in making its decision to select and retain the service of Mr. Singh's company. Had [CHR] exercised reasonable care in determining the safety policies, practices, and performance of Rheas Trans, Inc./RT Service, they would either have not retained the company as one of their transportation providers or would have initiated with them a specific improvement program designed to address the safety deficiencies documented and tracked their performance over time to assess whether, in fact, the improvement program impacted performance."[37]

**E.  CHR's Contract Addendum and Load Confirmation with RT Service**

24.     CHR and Costco Wholesale ("Costco") entered into a master Transportation Service Provider Agreement (the "Costco Agreement"). The Costco Agreement provides that Costco has no control or responsibility for CHR's employees, agents, or subcontractors performing transportation services and that they "**shall be in the sole and exclusive control of and shall be the responsibility of [CHR]**."[38]

---

[34] Nevada Department of Public Safety, Highway Patrol Investigation Report at 10. **Ex. N.**

[35] Dr. Thomas Corsi Affidavit (Attachment 1 at ¶¶ 15-16). **Ex. D.**

[36] *Id.* at ¶ 18; *accord id.* at ¶ 27. **Ex. D.**

[37] *Id.* at ¶ 28. **Ex. D.**

[38] Costco Agreement at 1-2 (emphasis added). **Ex. O.**

7

25.     CHR hired RT Service to transport ramen noodles for Costco from Pride Industries in Sacramento, California, to a Costco Depot in Salt Lake City, Utah (the "Load").[39] CHR memorialized the terms of the Load in an addendum to the master agreement between CHR and RT Service (the "Contract Addendum and Load Confirmation").[40]

26.     When CHR hired RT Service to take the Load, it did not ask Kuwar or Ronel Singh about or investigate RT Service's insurance revocations, safety rating, out-of-service violations, or the matching and related entries in CHR's Navisphere® database.

### F.  Collision Between RT Service and Allen Miller

27.     Ronel Singh picked up the Load on the morning of December 8, 2016, in California.[41]

28.     The collision occurred that evening, at approximately 10:00 p.m., on Interstate 80, twelve miles east of Elko, Nevada. I-80 has four lanes divided by a median into two directions. The "roadway was icy and snow-covered at the time of the collision."[42]

29.     Traveling eastbound on I-80, Ronel Singh lost control of the tractor-trailer, drove through the median, and blocked both westbound lanes of I-80 perpendicular to the travel lanes.[43]

30.     At approximately the same time, Plaintiff Allen Miller was driving westbound on I-80. Mr. Miller could not avoid colliding with RT Service's tractor-trailer. He became lodged and pinned underneath the tractor-trailer. As a result of the collision, Mr. Miller has quadriplegia.[44]

### G.  RT Service's Unsafe Driving: Too Fast for Conditions

31.     The Nevada Highway Patrol dispatched Sergeant Benjamin Jenkins to the collision scene. He drove to the scene with his lights on but siren off because "it was snowing and it was very low

---

[39] CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. at 10: 2-9 and 18:23-19:10. **Ex. A.**

[40] *See* Contract Addendum and Load Confirmation. **Ex. H.**

[41] Ronel Singh Dep. Tr. at 135:3-9. **Ex. G.** At the time, Mr. Singh's truck was in out-of-service condition, with 2 brakes out of adjustment. Belyus Affidavit at ¶ 4 (Attachment 1 at 4). **Ex. L.** For explanation of "out-of-service," *see supra* footnote 8.

[42] Dr. Thomas Corsi Affidavit (Attachment 1 at 5, ¶ 10). **Ex. D.**

[43] *Id.* at 5-6, ¶ 11. **Ex. D.** There is no dispute on summary judgment that RT Service and Ronel Singh's incompetence and negligence were a cause of this collision.

[44] *Id.* at ¶¶ 12-13. **Ex. D.**

visibility. And it took a while to get there." He was not "able to go much more than 35 to 40 miles an hour at the most."[45]

32.     The Nevada Highway Patrol concluded that a "primary cause" of the collision was Ronel Singh "traveling too fast for the icy/snowy road conditions."[46] Sergeant Jenkins agrees with the conclusion based on "what the roadway conditions were at the time and the fact of being out on the road driving [him]self, as well as the other motoring public that's out on that road in that same general area and not crashing their vehicles."[47]

33.     Ronel Singh admitted he was driving "around 60 to 65 miles per hour" but added that the posted speed limit was 75 miles per hour.[48] Mr. Singh's attempt to justify his speed based on the posted limit demonstrates his lack of knowledge and fitness to operate a tractor-trailer.

- All commercial motor vehicle ("CMV") drivers must have the knowledge and skill necessary to operate a CMV safely in extreme driving conditions (*i.e.*, "snow") and adjust the operation of the CMV to prevailing weather conditions, including speed selection. 49 C.F.R. §§ 383.111(12) and § 383.113(7).

- CMV drivers must exercise "extreme caution" when hazardous conditions like snow adversely affect visibility or traction. They must reduce speed. If conditions become sufficiently dangerous, they must discontinue operation of the CMV until they operate the CMV safely. 49 C.F.R. § 392.14. Every motor carrier and CMV driver must know about and comply with this regulation. 49 C.F.R. § 392.1.

- The CDL Manual—nearly identical in every state—provides that a "driver must reduce speed by about one-third (e.g., slow from 55 to about 35 mph) on a wet road. On packed snow, reduce speed by half or more. If the surface is icy, reduce speed to a crawl and stop driving as soon as you can safely do so."[49]

34.     In his second deposition, Mr. Singh admitted that if he were driving in the "same conditions today," he would not drive at the same rate of speed and would drive slower.[50] And he agreed that

---

[45] Sergeant Benjamin Jenkins Dep. Tr. at 20:1-17 and 40:4-10. **Ex. P.**

[46] Nevada Department of Public Safety, Highway Patrol Investigation Report at 26. **Ex. N.**

[47] Sergeant Benjamin Jenkins Dep. Tr. at 68:17-69:5. **Ex. P.**

[48] Ronel Singh Dep. Tr. at 279:14-16 and 154:3-4. **Ex. G.**

[49] https://dmvnv.com/pdfforms/dlbookcomm.pdf (Nevada CDL § 2.6.2 Matching Speed to Road Services).

[50] *Id.* at 382:20-383:1. **Ex. G.**

if he "had been driving 45 miles per hour that night . . .[his] truck would not have slid off the road."[51]

35.     Ronel Singh also claimed that the collision was the result of "black ice" on the roadway.[52] Sergeant Jenkins, however, testified that the roadway was "icy, slushy, snowy," but there was no evidence of "black ice."[53]

### H. RT Service's Unsafe Driving: Fatigue

36.     Since the 1940s, federal agencies have regulated drivers' hours-of-service because fatigue is a common cause of collisions involving tractor-trailers.[54] The FMCSRs require carriers to record their duty status in a logbook to track their compliance with the hours-of-service regulations. Drivers falsifying logbooks do so to circumvent the hours-of-service limit on the number of hours they can drive.[55]

37.     Steven Belyus, an expert in motor carrier regulations and crash reconstruction, testified about the relationship between falsified logs and the collision:

> "[T]here's the strong possibility that by falsifying one's log * * * a driver can drive longer than is reasonable and legal and develop fatigue." *** [Ronel Singh's] "failure to be in compliance with even telling the truth about what he was doing on his logbooks gives rise to the strong suspicion that he was working too much, too long, and drove into the median due to driver fatigue." *** "That's what the roadside inspector assumes when they find a driver has falsified his log. Even though they can't prove that he has driven beyond his hours permitted, they place him out of service so that they are sure he can get rest."[56]

38.     Steven Belyus testified that Ronel Singh's statement that he picked up the Load early in the morning does not match his logbook for that day. Rather, it indicates that Mr. Singh falsified his

---

[51] *Id.* at 403:1-9. **Ex. G.**

[52] *Id.* at 159: 6-10, 279:12-13, 387:17-20. **Ex. G.**

[53] Sergeant Benjamin Jenkins Dep. Tr. at 70:1-6. **Ex. P.**

[54] Steven Belyus Affidavit (Attachment 1 at 3). **Ex. L.**

[55] For more explanation of the hours-of-service and logbook regulations, *see supra* footnote 8.

[56] Steven Belyus Dep. Tr. 173:16-23, 163: 6-15, and 175:23-176:4. **Ex. L.** As set forth in footnote 8, a falsified logbook is "an apparent attempt to conceal a violation of the regulations." https://www.azrockproducts.org/wp-content/uploads/April-1-2016_OOSC_U.S._Blue_Paper.pdf   (2016) (North American Standard Out-of-Service Criteria for certified government inspectors of large trucks at 7).

logbooks and would have been on duty beyond the 14-hour maximum at the time of this collision, which is an out-of-service violation. "Mr. Singh's log for the day of the crash was falsified at two points [ ]. He was unlikely to make the delivery destination within his 11-hour driving time[] and would not be able to meet the delivery timeline after having to take 10 hours off duty."[57]

39.   Mr. Belyus testified that Ronel Singh's "fatigue caused or contributed to the collision.[58] He pinpointed at least 21 false logbook entries from Mr. Singh. And he concluded that Mr. Singh's "complete disregard for [hours-of-service] rules may have caused fatigue which contributed to this crash. Due to [the] prolific falsification of his record of duty status, it is impossible to track."[59]

## II.     STANDARD OF REVIEW AND GOVERNING LAW

CHR has the burden of establishing the absence of a genuine issue about any material fact.[60] Summary judgment is improper where reasonable minds could differ on a material fact. Even when the parties do not dispute the evidentiary facts, summary judgment also is improper when they dispute ultimate factual conclusions.[61] In deciding on a summary judgment motion, courts view all facts and draw all inferences in the light most favorable to the nonmoving party.[62] The substantive law of Nevada governs this diversity action.[63]

## III.    THERE ARE JURY QUESTIONS ABOUT NEGLIGENT SELECTION.

### A.  Sworn evidence raises genuine issues of material fact about the standard of care.

Defendant CHR admits that it had a duty to exercise "reasonable" care in selecting a motor carrier that is "fit for the position."[64] It argues that *as a matter of law,* its only duty—the standard of reasonable care—is to check that a motor carrier is legal to be on the road (i.e., has registration

---

[57] Steven Belyus Affidavit (Attachment 1 at 8). **Ex. L**; *cf.* Ronel Singh Dep Tr. 135: 3-19. **Ex. G.**

[58] Steven Belyus Dep. Tr. at 97:21-23 and 162:22-163:15 **Ex. Q.**

[59] Steven Belyus Affidavit (Attachment 1 at 8-9). **Ex. L.**

[60] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[61] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).

[62] *Kaiser Cement Corp. v. Fischbach & Moore, Inc*., 793 F.2d 1100, 1102 (9th Cir. 1986)

[63] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[64] ECF No. 124 at 16-17.

from the FMCSA and insurance and does not have an Unsatisfactory safety rating under the FMCSRs).[65] That ostensible limit—in essence, an argument that the FMCSRs or FMCSA preempt state-law negligence claims—is belied by the plain language of the FMCSRs, rejected by courts across the country, and opposed by sworn expert testimony and other credible evidence.

### 1. The FMCSRs do not preempt negligent hiring claims.

Congress mandated that the FMCSRs "shall establish *minimum* Federal safety standards for commercial motor vehicles."[66] The FMCSRs implement the mandate, providing that unless an FMCSR imposes a "higher standard of care," comply with state law.[67]

In *Ramos-Becerra v. Hatfield,* a federal district court held that the FMCSRs do not preempt state-law negligent selection claims against freight brokers.[68] The court reasoned that the FMCSRs establish "minimum safety standards" and the common law duty to use reasonable care in selecting a carrier ("subsidiary duties to check safety [data] and evaluation of carriers") is not "incompatible" with the FMCSRs.[69] "The FMCSRs are not the exclusive source for duties and standards in a state law negligent hiring claim [against a broker]."[70] And "a common law duty upon [brokers] to use reasonable care in selecting carriers furthers the critical federal interest in protecting drivers and passengers on the nation's highways."[71]

Likewise, in *North Carolina Motorcoach Association v. Guilford County Board of Education,* a trade association argued that the FMCSRs preempt the county's criteria for getting

---

[65] *Id.* Without registration and insurance, a carrier has no legal right to be on the road, 49 C.F.R. § 392.9a; an Unsatisfactory safety rating also makes it illegal for the carrier to be on the road, 49 C.F.R. § 385.13.

[66] 49 U.S.C. § 31136(a)(1) (emphasis added).

[67] 49 C.F.R. § 392; *accord, e.*g., 49 C.F.R. § 391.1 (setting "*minimum* qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers" and "*minimum* duties" of motor carriers with respect to qualification of drivers) (emphasis added).

[68] *Ramos-Becerra v. Hatfield,* No. 1:14-CV-0917, 2016 WL 4127387 (M.D. Pa. Aug. 3, 2016).

[69] *Id.* at *4 (citing 49 U.S.C. § 31136(a)).

[70] *Id.* at *5.

[71] *Id.* (quoting *Schramm v. Foster,* 341 F. Supp. 2d 536, 551 (D. Md. 2004)); *see also Ramos-Becerra v. Hatfield,* 2016 WL 5719801 (M.D. Pa. Oct. 3, 2016) (collecting cases) (related decision) ("following other federal courts and relying upon the FMCSRs intent to minimize the preemption of state laws, the court finds that the FMCSRs do not preempt Plaintiffs' [state] common law claims for . . . negligent hiring").

on an approved carrier list.[72] The criteria included a minimum $10 million liability insurance policy (far exceeding the minimums set by 49 C.F.R. § 387.33) and county inspection of the carriers' operations, vehicles, and drivers.[73] The court held that the FMCSRs did not preempt the county's qualifications because (a) they would not "prevent full compliance" with the FMCSRs, (b) they were not "in lieu of" federally mandated inspections, and (c) "additional inspection requirements would [not] in any way reduce highway safety."[74]

## 2. Neither the FMCSA nor the FMCSRs impose exclusive duties.

That the FMCSA accepts a carrier's registration application does not mean that the carrier operates safely. By definition, the federal registration scheme for motor carriers is forward-looking. It does not require the FMCSA to certify that the carrier is safe; it requires a carrier to certify that it has met the registration requirements and is willing to comply with its safety obligations.[75]

Even CHR does not consider every possible carrier holding federal registration when it makes its selections. It advertises that it has developed what it refers to as the "largest pool of vetted, reliable, high-quality carriers in North America."[76] CHR's statement suggests that it is already industry standard for brokers to develop criteria for carrier selections, winnowing down the field of eligible carriers to those which meet the criteria of "vetted, reliable, and high-quality."[77]

Denying summary judgment on the applicable standard of care, courts repeatedly hold that a carrier's registration, insurance, and lack of Unsatisfactory safety rating, does not immunize a broker from liability for negligent selection or retention of a carrier. *See, e.g., Schramm v. Foster*, 341 F. Supp.2d 536, 551 (D. Md. 2004) (denying CHR's summary judgment motion, despite the

---

[72] 315 F. Supp. 2d 784, 789-90, 803-04 (M.D.N.C. 2004).

[73] *Id.* at 789-90, 803-04.

[74] *Id.* at 803-04 (citing and quoting *Specialized Carriers & Rigging Ass'n v. Virginia*, 795 F.2d 1152, 1156 (4th Cir. 1986)).

[75] 49 U.S.C. § 13902 (a)(1)(A). Notably, given the number of applicants and registered carriers, the FMCSA "does not have the resources to vet all new carriers." https://www.gao.gov/products/gao-12-364.

[76] See, e.g., https://www.chrobinson.com/en-us/logistics/truckload/.

[77] *Id.*

13

carrier's registration and lack of unsatisfactory rating, because the "duty to use reasonable care in the selection of carriers" includes "subsidiary duties to check the safety statistics and evaluations of carriers" and "maintain internal records of the persons with whom it contracts"); *Jones v. CHR*, 558 F.Supp.2d 630, 644-47 (W.D. Va. 2008) (denying CHR's summary judgment motion, despite carrier's registration, because carrier's history of regulatory violations and use of an unsafe driver generate a fact issue on the duty to investigate further); *accord, e.g., Beavers v. Victorian*, 38 F.Supp.3d 1260, 1272-73 (W.D. Okla. 2014) (same); *Ramos-Becerra v Hatfield, No.* 2016 WL 5719801, at *5 (M.D. Pa. Oct. 3, 2016) (same); *Riley v. A.K. Logistics, Inc*., 2017 WL 2501138, at *5 (E.D. Mo. June 9, 2017) (same) *Scott v. Milosevic,* 372 F. Supp. 3d 758, 767 (N.D. Iowa 2019) (same); *Skowron v. CHR*, 2020 WL 4736070, *2 (D. Mass. Aug. 14, 2020) (same). [78]

The 2019 *Scott v. Milosevic* decision is instructive.[79] The *Scott* broker also argued that it met the standard of care by verifying a motor carrier's federal registration and insurance. The *Scott* court held that there were genuine issues of material fact on the carrier's competence. The court relied, among other things, on expert evidence that the carrier was a "new entrant," a "red flag" which "should have triggered a more extensive inquiry because new entrants have a statistically higher rate of [] collision."[80] The court also relied on Dr. Corsi's testimony about industry practice for new entrant and **unrated motor carriers**, including that some brokers will not hire carriers in business for less than a year (and some, less than five years) or that are unrated "without further inquiry."[81] Under these facts, the *Scott* court concluded that "it does not automatically follow that

---

[78] As for CHR's final argument (ECF No. 124 at 21), in each of the many cases denying summary judgment on a broker's negligent hiring, the broker hired the carrier, not the driver. The linchpin in most of the cases—as it is here—is unsafe driving and a broker's negligent hiring of the historical unsafe and unfit carrier that put the unsafe and unfit driver on the road.

[79] 372 F. Supp. 3d at 767.

[80] *Id.*

[81] *Id.* (emphasis added).

it would have been negligent to hire [the carrier] . . .or that [the broker's] alleged negligence was a proximate cause of the collision," but **"[t]hese are issues for the jury**."[82]

Like in *Scott v. Milosevic,* there are jury questions here based on evidence of the numerous red flags CHR ignored, including that RT Service was a new entrant when CHR hired it, RT Service was Unrated at all times, and RT Service submitted at least 5 new insurance certificates to CHR in 2016.[83] CHR also violated its policy to investigate the matching and related information in its database to determine whether RT Service was a chameleon carrier.[84] As Dr. Corsi testified, had CHR

> exercised reasonable care in determining the safety policies, practices, and performance of [] RT Service, they would either have not retained the company [ ]or would have initiated with them a specific improvement program designed to address the safety deficiencies documented and tracked their performance over time to assess whether, in fact, the improvement program impacted performance.[85]

### 3. This is a classic battle of experts regarding industry standards and breach.

There is no dispute that Nevada recognizes a cause of action for negligent hiring of a contractor.[86] Nor is there any dispute that Nevada requires a "reasonable background check on a contractor to ensure they are fit for the position."[87] At issue is what constitutes a "reasonable background check" in the broker industry. Even though RT Service was Unrated, and there were red flags about it being a chameleon carrier in CHR's database, CHR contends that it had no duty to conduct *any* further investigation beyond checking that it was legal for RT Service to be on the

---

[82] *Id.*; *accord, e.g., Riley v. A.K. Logs.*, 2017 WL 2501138, at 3-5 (emphasis added) (denied CHR's summary judgment motion because, notwithstanding carrier's registration and insurance, there are genuine issues of material fact about the standard of care for hiring an unrated carrier).

[83] Disputed Material Facts ¶¶ 8, 11, 20-21.

[84] Disputed Material Facts ¶¶ 12-16.

[85] Disputed Material Facts ¶ 23.

[86] ECF No. 124 at 1 (stating Nevada law on negligent hiring of a contractor); *accord, e.g., Havas v. Hughes Estate*, 643 P.2d 1220 (Nev. 1982) (reversing grant of summary judgment due to issue of material fact on question of hotel's direct liability for contracting with a comedian it knew or should have known would make defamatory statements).

[87] *Id.* (internal quotation marks and citations omitted).

road.[88] Like the many cases outlined above denying the broker's summary judgment, there are traditional factual disputes and a battle-of-experts on what satisfies the standard of care here, including:

- The CHR-Costco Agreement provides that CHR's "employees, agents, or subcontractors performing transportation services" under the agreement "shall be in the sole and exclusive control of and shall be the responsibility of [CHR]."[89]

- CHR advertises that it only uses a pool of vetted "high-quality carriers," suggesting that it is already the standard in the industry for brokers to develop criteria for selecting carriers, winnowing down the field of eligible carriers to those who meet the broker's criteria.[90]

- Bruce Johnson, CHR's Rule 30(b)(6) corporate representative, agrees that a "broker has a duty to use reasonable care when selecting a trucking company to haul loads," it is "part of CHR's obligation [] to hire safe trucking companies," and "driving a tractor-trailer involves a risk of physical harm unless it is skillfully and carefully done."[91]

- CHR violated its policy and reasonable care when it failed to refer RT Service to its Carrier Services Group to investigate whether RT Service is a chameleon carrier given the red flags in CHR's database linking Rheas Trans to RT Service, including (i) listing Rheas Trans, Kuwar Singh, and Ronel Singh as "related parties," (i) listing Rheas Trans as the "parent corporations," and (iii) providing Rheas Trans' e-mail address and telephone numbers.[92]

- CHR contracted with RT Service—a New Entrant and Unrated carrier—only one month after RT Service registered with the FMCSA, but did not investigate the safety performance record, safety management practices, or regulatory knowledge of RT Service, Ronel Singh, or Kuwar Singh. [93] As an expert in transportation and logistics, Dr. Thomas Corsi's opinion is that CHR "violated a reasonable standard of care" in ignoring publicly available and highly unsatisfactory safety performance data about" RT Service in hiring and retaining RT Service. [94]

- Steven Belyus attested that "a very brief telephone interview" with Ronel Singh would have revealed his lack of knowledge about basic safety. He also stated that CHR should have suspected that RT Service was having an insolvency issue and investigated when RT Service submitted 5 different certificates of insurance, and an involuntary revocation, in

---

[88] ECF No. 124 at 1. As set forth in footnote 65, without registration and insurance, a carrier has no legal right to be on the road; an Unsatisfactory safety rating also makes it illegal for the carrier to be on the road.

[89] Disputed Material Facts ¶ 24.

[90] Disputed Material Facts ¶ 2.

[91] Disputed Material Facts ¶ 3.

[92] Disputed Material Facts ¶¶ 12-16.

[93] Disputed Material Facts ¶ 15.

[94] Disputed Material Facts ¶ 23.

2016 alone. And the strong correlation between insurance and safety is widely known in the trucking industry. [95]

- Even defense expert Lane VanIngen admitted that he "would tend to leave . . to a jury" whether a reasonably careful broker should take any action if it detects or had data that a carrier is a chameleon. And he would leave to the jury whether the "common familial relationship" or "common . . management . . .would rise to a level where it was negligence" to hire the chameleon carrier. [96]

### 4. CHR's FAST Act argument is a red herring.

Defendant CHR argues that the data compiled on the FMCSA website is no longer available or insufficiently reliable to allow brokers to assess whether a particular carrier operates safely under the FAST Act, Pub. L. No. 114-94, 129 Stat. 1312 (the "FAST Act"). Their argument is off the mark.

First, Plaintiff has submitted substantial evidence that CHR's *prior dealings* with Rheas Trans and RT Service should have raised red flags about RT Service's safety. Despite the matching and related information in CHR's database about the two carriers, Defendant CHR never referred the matter to its internal Carrier Services Group or otherwise investigated when it entered into a contract with RT Service. Likewise, CHR did not investigate RT Service after RT Service submitted at least 5 new insurance certificates to CHR in 2016 alone. [97] In short, Plaintiff's negligent hiring claim does not depend solely on the FMCSA website or data.

Second, there is no dispute that CHR knew that RT Service was an Unrated carrier. Still, CHR did not investigate RT Service's safety management controls and fitness. [98]

Third, CHR had access to other public FMCSA data that should have raised red flags. Out-of-service rates [99] for RT Service's driver-related violations were more than double the national average, and its vehicle-related violations were more than 170% of the national average. This data

---

[95] Disputed Material Facts ¶ 17.

[96] Lane VanIngen Dep. Tr. at 34:10-35:3 and 63:18-64:1. **Ex. R.**

[97] Disputed Material Facts ¶¶ 20-21.

[98] CHR admits that it checks carriers' safety ratings. Disputed Material Facts ¶ 11. In any event, the FAST Act did not remove carriers' safety ratings (Satisfactory, Conditional, Unsatisfactory, or Unrated) from public view.

[99] *See supra* footnote 8 for explanation of "out-of-service" violations.

was readily available to CHR at all times through the FMCSA website https://safer.fmcsa.dot.gov/. *The FAST Act did not affect the availability of this data.*

Fourth, the FAST Act does not bar reliance on the FMCSA website data. The current FMCSA website disclaimer was added in 2011 after a settlement and replaced an older version.[100] Dr. Thomas Corsi explains that "[i]t is inaccurate to say that the FMCSA recommends brokers and carriers not to use [safety performance data on the FMCSA website] to draw conclusions about a motor carrier's safety. The wording of the FMCSA statement is that no one should draw conclusions about a motor carrier's overall safety *simply* from [this] data."[101]

Fifth, numerous courts continue to permit reliance on the FMCSA website data *after* the FAST Act took effect in December 2015.[102] Specifically addressing the FAST Act disclaimer argument, the *Turner v. Syfan Logistics* court held that "the disclaimer . . . goes to the reliability of the data contained on the FMCSA website"; it thus "goes to the weight of the evidence," and not its admissibility.[103] CHR is free to raise the reliability of the data on the FMCSA website at trial on cross-examination.

Finally, any argument about BASIC scores after Congress enacted the FAST Act is attacking a straw man. As set forth above, Plaintiff's negligent hiring claim does not depend on FMCSA data (*see* prior dealings between CHR and RT Service and Rheas Trans above). In any event, the FMCSA website provides public access to raw safety data like carriers' out-of-service and other violations from roadside inspections and state-reported crashes. There can be no dispute that the FAST Act did not remove this data from public view.

---

[100] https://csa.fmcsa.dot.gov/WhatsNew/Article?articleId=30184 (settlement with three trucking groups).

[101] Dr. Thomas Corsi Affidavit (Attachment 2 at 1) (emphasis added). **Ex. D.**

[102] *See, e.g., Amalu v. Stephens Transp., Inc.*, 2018 WL 6829044, at *5 (W.D. Tenn. Mar. 12, 2018); *Mann v. CHR*, 2017 WL 3191516, at *11 (W.D. Va. Ju. 27, 2017); *Turner v. Syfan Logistics, Inc.*, 2016 WL 1559176 at *10 (W.D. Va. 2016); *see also, supra*, at 15 (cases from 2016 to the present denying summary judgment based on, among other thing, evidence of the carrier's safety performance data on the FMCSA website).

[103] *Turner*, 2016 WL 1559176 at *10.

The FMCSA's Safety Measurement System (SMS) uses this raw safety data to quantify carriers' performance in seven areas, known as the Behavior Analysis and Safety Improvement Categories (BASICs). For each BASIC, the FMCSA calculates a "BASIC measure," which is an absolute number, using applicable violations recorded during roadside inspections, carrier size, and miles traveled, among other things. Since 2010, the BASIC measures have been available on the FMCSA website, but the FAST Act temporarily removed them from public view from December 2015 to March 2016.[104]

For each BASIC measure, the FMCSA places carriers in a safety event or peer group with other carriers that have a similar number of events and assigns a "BASIC percentile ranking" to carriers from 0 to100 (the higher the percentile, the worse the performance) to prioritize them for intervention. The BASIC measure is absolute, but the BASIC percentile ranking is relative to other carriers in the group. From 2010 to 2015, the BASIC percentile rankings were available on the FMCSA website, but the FAST Act, which took effect in December 2015, temporarily removed them from public view while continuing to make them available to carriers and law enforcement. As of this filing, the BASIC percentile rankings still are not available for public view. But, again, the FAST Act never removed the underlying raw safety data used to formulate the BASIC measures or percentiles from public view.[105]

For the nine months before the December 2016 collision, RT Service exceeded the FMCSA thresholds and was at alert levels for the Hours-of-Service Compliance and Vehicle Maintenance BASICs.[106] It is widely known in the trucking industry that motor carriers with two or more BASIC measures above the FMCSA thresholds had crash rates during the intervening 18-month period that were twice the rate of carriers having no BASIC above the threshold levels. [107] If CHR had

---

[104]      https://www.fmcsa.dot.gov/newsroom/fmcsa-restores-property-carriers-absolute-measures-compliance-fast-act.

[105]      https://csa.fmcsa.dot.gov/Documents/Safety_Ratings_Factsheet_GRS_M.PDF; https://csa.fmcsa.dot.gov /documents/smsmethodology.pdf.

[106] Dr. Thomas Corsi Affidavit (Attachment 1 at 11, ¶ 25) **Ex. D**; *see also* Steve Belyus Affidavit (Attachment 1 at 4). **Ex. L.** For background on hours-of-service violations, *see supra* footnote 8.

[107] Dr. Thomas Corsi Affidavit (Attachment 1 at 10, ¶ 22) **Ex. D.**

19

1   investigated the initial or ongoing red flags about RT Service (*i.e.,* Unrated, matching information

2   in CHR's database with Rheas Trans, numerous insurance certificates, and out-of-service

3   violations), a reasonable investigation should have included questions to RT Service about its

4   safety management controls, training, knowledge, BASIC measures, and percentile scores, out-of-

5   service violations, and other indicators of fitness to be on the road.

6         For the avoidance of doubt, however, Plaintiff does not and need not allege that the BASIC

7   measures or the percentile scores were red flags here. As perhaps belabored above, there is more

8   than enough credible evidence about RT Service's lack of safety fitness without the BASIC

9   measures or percentile scores. What is more, a jury certainly could find that a reasonable broker

10   would inquire, especially with all of the other red flags, about a carrier's BASIC measures and

11   percentile scores. Still, it is by no means a necessary finding here.

12         **B.   There are genuine issues of material fact about proximate cause.**

13         Courts are "reluctant to grant summary judgment in negligence cases because

14   foreseeability, duty, proximate cause, and reasonableness usually are questions of fact for the

15   jury."[108] "Questions of . . .proximate cause . . . become questions of law only when the evidence

16   will support no other inference."[109]

17         As set forth above, the first jury question for Plaintiff's negligent hiring claim is whether

18   CHR violated the duty to exercise reasonable care by failing to investigate RT Service and learn

19   about RT Service's incompetence. The second jury question—proximate cause—is whether a

20   reasonable broker that had learned of RT Service's incompetence should have foreseen that a

21   driver-related collision might probably result from RT Service's incompetence.

22         For example, in *Riley v. A.K. Logistics, Inc.*, the federal district court denied CHR's motion

23   for summary judgment because there were genuine issues of fact about (a) what CHR should have

24   known about the carrier and (b) whether there was a causal connection between the carrier's history

25

26   [108] *Morgan v. Wal-Mart Stores, Inc*., 2019 WL 1386376, at *2 (D. Nev. March 26, 2019) (citing *Joynt v. California Hotel & Casino*, 835 P.2d 799, 801 (Nev. 1992). The *Morgan* and *Joynt* courts denied the

27   defendant's motion for summary judgment.

28   [109] *Id.* (internal citations omitted).

of unsafe driving and the unsafe driving that caused the collision ("improper lane change" and "following . . too closely").[110] There was no evidence that the carrier had a history of improper lane change and following too closely. But the carrier's history of "unsafe driving and hours-of-service" violations were driver-related and created a sufficient nexus for the *Riley* court to deny CHR's summary judgment on proximate cause.

The Plaintiff need not demonstrate that RT Service or its drivers had a history of driving too fast for the conditions, losing control of the tractor-trailer, crossing over the median, blocking the roadway, and causing a collision that resulted in quadriplegia, to raise a jury question about a proximate cause. Almost no facts would ever satisfy such a tight nexus requirement. Not surprisingly, courts reject CHR's argument that the *precise* type and immediate cause of the crash or injury must be foreseeable to survive summary judgment on proximate cause.

For example, the *Jones v. CHR* court held that "it is sufficient that an ordinary, prudent person ought, under the circumstances, to have foreseen that an injury might probably . . .result from the negligent act."[111] The *Jones* court relied on the fact that (i) CHR was aware of the carrier's Conditional safety rating but did no further investigation, (ii) the carrier's driver and vehicle data indicated that it was the "low end of the curve in terms of driver and vehicle safety issues," (iii) the driver was inexperienced, and (iv) the crash report indicated that inexperience could have been a factor. Denying CHR's summary judgment motion, the *Jones* court stated:

> It is possible that the finder of fact could determine that [the carrier's]s negligent driver hiring and safety procedures, of which [CHR] should have been aware, were a proximate cause of the crash, which is the subject of this case. On the other hand, the evidence regarding the actual cause of the crash is sparse, and it is also possible that the finder of fact could determine that, regardless of [the carrier]'s incompetence, the subject crash was not the result of that incompetence.[112]

Plaintiff has submitted sworn, credible testimony that (i) CHR knew RT Service did not even have a safety rating (Unrated) but did no further investigation; (ii) CHR ignored red flags in

---

[110] *Riley,* 2017 WL 2501138 at *5.

[111] 558 F. Supp.2d at 648 (internal citations omitted).

[112] *Id.*

their database that RT Service and Rheas Trans were related entities and that RT Service's insurance repeatedly changed but did not investigate further; (iii) had CHR investigated, it would have learned about RT Service's high rate of out-of-service violations for driver-related issues, including unsafe driving and hours-of-service violations, that RT Service was a chameleon carrier; and that Ronel Singh lacked basic knowledge about compliance with the FMCSRs, and (iv) the immediate cause of the collision was RT Service driver Ronel Singh's unsafe driving (i.e., driving too fast for snowy conditions) and fatigue.[113] At the very least, there is a jury question about whether these red flags—of which CHR should have been aware—were a proximate cause of the collision.

And the proximate cause nexus is even closer here than in *Riley v. AK Logistics*, *Jones v. CHR,* and the other cases. Some of RT Service's precise historical incompetence—their driver, Ronel Singh, had a history of speeding and speeding in inclement weather—was also the immediate cause of the collision (i.e., driving too fast for the snowy conditions).[114] And RT Service's history of hours-of-service and logbook violations, together with Plaintiff's expert Steve Belyus's conclusion about false logbooks from the date of the collision and the role of fatigue in the collision, also provide a sufficient nexus to survive summary judgment on proximate cause.[115]

Finally, Defendant CHR's attempt to rely on *McComb v. Bugarin* is unavailing. In *McComb*, the plaintiff failed to present *any* evidence rebutting the shipper's evidence that the collision was due to the lack of traffic lights and not unsafe driving.[116] The court granted the shipper's summary judgment motion on negligent hiring because there was *zero* connection between the cause of the collision and the carrier's history of safety violations.[117] Here, in sharp contrast and as set forth above, Plaintiff has submitted more than sufficient sworn, credible evidence to raise a jury question about whether a reasonable broker should have foreseen that a

[113] Disputed Material Facts ¶¶ 31-39.

[114] Disputed Material Facts ¶ 22.

[115] Disputed Material Facts ¶¶ 37-39.

[116] 20 F. Supp. 3d 676 (N.D. Ill. 2014).

[117] *Id.* at 685.

collision due to unsafe driving might occur if they had investigated RT Service's safety management practices and history.

## IV.   VICARIOUS LIABILITY IS A LIVE ISSUE.

### A.  Dismissal of the vicarious liability claim does not foreclose the theory at trial.

Negligent hiring is not the "sole remaining" claim.[118] At the outset of this case, CHR moved to dismiss Plaintiff's vicarious liability claim on the ground that vicarious liability "is not an independent cause of action, but rather a theory assigning liability" in Nevada.[119] Plaintiff consented to the dismissal *without prejudice* because Defendant did not argue that the vicarious liability claim is without merit but instead argued that it is a legal theory subsumed in the negligence count.[120] Plaintiff clarified that their consent did "not preclude [P]laintiff from arguing that [the] theory applies in the instant case" at trial.[121] Accordingly, dismissal of the vicarious liability claim does not foreclose Plaintiff from arguing that CHR is vicariously liable for the negligence of RT Service, Rheas Trans, or Ronel Singh at trial.

### B.  Dismissal and release of the Settling Defendants do not foreclose vicarious liability.

The Court approved a settlement with RT Service, Rheas Trans, and Ronel Singh (the "Settling Defendants")—memorialized in the Release of Liability Insurance Carrier and Covenant Not to Execute (the "Release and Covenant")[122]—and dismissed the Settling Defendants.[123] The Release and Covenant specifically provides: "Nothing in the Agreement shall be deemed to constitute any waiver nor shall the undersigned be estopped with reference to any and all other rights or claims which he may have against any other party . . .."[124]

---

[118] ECF No. 124 at 1.

[119] ECF No. 59 at 4.

[120] ECF No. 70.

[121] *Id.* (citing *Garcia v. Nevada Prop. 1, LLC*, 2015 WL 67019 at *3 (D. Nev. Jan. 6, 2015)).

[122] *See* Release and Covenant. **Ex. S**.

[123] ECF No. 96 (Order approving good faith settlement).

[124] Release and Covenant at 2. **Ex. S**.

In the seminal case *Van Cleave v. Gamboni Construction Company*, the Nevada Supreme Court held that Nevada's Uniform Contribution Among Tortfeasors Act, Nev. Rev. Stat. § 17.245 (the "Uniform Act") "applies to vicarious liability situations so that the release of an employee does not release a vicariously liable employer, unless the terms of the release document so provide."[125]

In addition to relying on the plain language of the Uniform Act, the *Van Cleave* court relied on the expressed public policy of the Uniform Act to "encourage rather than discourage settlements."[126] The court reasoned that injured parties "would be reluctant to settle with the [ ] agent" if it would "extinguish [their] cause of action against the master or principal, unless [they] could settle[] with the [ ] agent for an amount sufficient to compensate [] for [their] entire loss."[127]

As in *Van Cleave*, there is no indication that Plaintiff Allen Miller, "in settling promptly with the [Settling Defendants]," believed he "was settling for h[is] entire loss."[128] And like the reservation of rights against "anyone else" in *Van Cleave*, the express reservation of rights against "any other party" in the Release and Covenant here indicates that Plaintiff "did not believe the settlement with [the Settling Defendants] was for h[is] entire claim."[129]

---

[125] *Van Cleave v. Gamboni Const. Co.*, 706 P.2d 845, 847 (Nev. 1985).

[126] *Id.* at 849 (internal citation omitted).

[127] *Id.*

[128] *Id.*

[129] *Id.; accord e.g., Woodrum v. Johnson,* 559 S.E.2d 908, 914 (W. Va. 2001) (relying on *O'Dell v. Universal Credit Co.*, 191 S.E. 568 (W. Va. 1937), which permitted a plaintiff to voluntarily dismiss a negligent agent while still maintain an action against the vicariously principal). The *Woodrum* court reasoned:

> To the extent possible rules of law should produce results consistent with the expectations of ordinary citizens. Surely most people *** would be surprised to discover that [a] release did not mean what it said when it purported to preserve their claim against [a derivatively liable defendant]. Accordingly, when parties sign an agreement releasing one defendant with the clearly expressed expectation that they will be able to proceed against others, that expectation should be given effect by the courts.

*Id.*

And, even more so, Plaintiff's Motion for Good Faith Settlement specifically references the release provision of the Uniform Act.[130] Mr. Miller requires approximately $545,000 annually—for a total of approximately $18 million—to receive necessary care and rehabilitation. Mr. Miller certainly did not believe that the $750,000 settlement with the Settling Defendants (the limit of their insurance policy) paid into a special needs trust for his care covered his entire loss.[131]

Nevada cases following *Van Cleave* include *De Blanc v. Aloha Airport Exp., LLC*, 416 F. Supp. 3d 1056, 1061 (D. Nev. 2019) (relying on *Van Cleave,* its progeny, and general agency principles to hold that the expiration of the statute of limitations against the agent does not discharge the principal of vicarious liability)[132]; *Steely v. General Motors Corp.*, 1986 WL 14395 (D. Nev. Dec. 2, 1986) (relying on *Van Cleave* and other states' interpretation of the Uniform Act that even broad release language—"this is a compromise settlement of all my claims of every nature and kind whatsoever arising out of the accident"—did not release other tortfeasors); *McCrosky v. Carson Tahoe Reg. Med. Ctr.*, 408 P.3d 149, 153 (Nev. 2017) (relying on *Van Cleave* to hold that release of agent-employee does not preclude vicarious liability of principal-employer); *Russ v. Gen. Motors Corp.*, 906 P.2d 718, 720 (Nev. 1995) (relying on *Van Cleave* and the language of the Uniform Act to hold that the common-law rule that "the release of one tortfeasor automatically released all other potential tortfeasors" was "harsh and without any rational basis"); *Hill v. Keolis Transit Servs., LLC*, 2018 WL 2398379 at *1 (Nev. Dist. Ct. May 9, 2018) (relying on *Van Cleave* to hold that plaintiff did not need to sue employee-agent to proceed against employer-principal for vicarious liability and principal's vicarious liability not extinguished due to expiration of the statute of limitations against the agent).

### C.  Defendant CHR cannot satisfy its burden on summary judgment.

Defendant CHR does not address vicarious liability in its summary judgment motion. Accordingly, it cannot satisfy its initial burden of showing the absence of a genuine issue of

---

[130] ECF No. 90 at n.5 (quoting Nev. Rev. Stat. § 17.245(1).

[131] ECF No. 94 at 4-5.

[132] *See id.,* 416 F. Supp. 3d at 1061 (quoting *Verrastro v. Bay Hospitalists, LLC*, 208 A.3d 720, 728-29 (Del. 2019) ("dismissal of the agent . . .does not automatically eliminate the principal's vicarious liability").

material fact about the theory of vicarious liability.[133] A party opposing summary judgment "need not file any countervailing affidavits or other materials but is entitled to a denial of the motion for summary judgment where the movant's papers are insufficient on their face or themselves to demonstrate the lack of any material issue of fact."[134] On this basis alone, the Court should not preclude Plaintiff from pursuing the vicarious liability theory at trial.

**D.  Even if it had satisfied its burden, there are genuine issues of material fact.**

Out of an abundance of caution, this Memorandum outlines the genuine issues of material fact about applying the vicarious liability theory here. As a threshold matter, many cases have denied CHR and other broker's summary judgment motions on vicarious liability, including cases dismissing the negligent hiring claim based on FAAAA preemption.[135]

Under Nevada law, for purposes of vicarious liability, an agency relationship is "formed when one who hires another retains a contractual **right to control** the other's manner of performance." [136] An agency relationship can be "either express or implied in fact."[137] Whether an agency exists generally is a question of fact for the jury.[138]

As an alternative to the right to control test, courts applying Nevada law have used a multifactor analysis to determine whether there is a jury question about vicarious liability over RT Service and Ronel Singh:

> (1) the degree of supervision; (2) the source of wages; (3) the existence of a right
> to hire and fire; (4) the right to control the hours and location of employment; and

---

[133] *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 AFL–CIO v. Martin Jaska, Inc*., 752 F.2d 1401, 1405 (9th Cir.1985) ("The initial burden of showing the absence of material factual issues rests on the proponent of a summary judgment motion.").

[134] *Sheet Metal Workers' Int'l Ass'n Local No. 355 v. N.L.R.B*., 716 F.2d 1249, 1254 (9th Cir. 1983).

[135] *See, e.g., Ciotola v. Star Transp. & Trucking, LLC*, 481 F. Supp. 3d 375, 391 (M.D. Pa. 2020); *Ying Ye v Glob. Sunrise, Inc*, 2020 WL 1042047, at *5 (N.D. Ill. Mar. 4, 2020); *Riley v. AK Logistics, Inc*., No. 1:15-CV-00069-JAR, 2017 WL 2501138, at *7 (E.D. Mo. June 9, 2017).

[136] *Grand Hotel Gift Shop v. Granite State Ins. Co*., 839 P.2d 599, 602 (Nev. 1992) (emphasis added).

[137] *Keystone Realty v. Osterhus*, 807 P2d 1385, 1388 (Nev. 1991).

[138] *N. Nev. Mobile Home Brokers v. Penrod*, 610 P.2d 724, 726 (Nev. 1980); *accord, e.g., Herring-Hall-Marvin Safe Co v. Balliet*, 145 P. 941, 943 (Nev. 1915), *aff'd on reh* 190 P 76 (Nev. 1920).

1    (5) the extent to which the workers' activities further the general business concerns
of the alleged employer.[139]

2    Under either the right to control or multifactor analysis, sworn and credible testimony

3    demonstrates that whether CHR is vicariously liable for RT Service and Ronel Singh's negligence

4    is a jury question.

5    The broker-carrier master contract between CHR and RT Service provides:
•    CHR controls the method of payment, all money, and payments
6    •    CHR prohibits RT Service from billing or contacting the customer for payment
•    CHR has the exclusive right to resolve payment disputes on behalf of RT Service
7    •    RT Service must purchase insurance naming CHR as an additional insured
•    RT Service must not sub-contract, broker, or tender any freight under the contract
8    with CHR to any third party
•    CHR may terminate the relationship with RT Service "in its sole discretion."[140]

9

10    CHR's Contract Addendum and Load Confirmation requires RT Service to:
•    dedicate their tractor-trailer for the "exclusive use" of CHR while transporting the
11    Load, or they could forfeit their pay
•    inform CHR within 30 minutes of arrival at and departure from the shipper
12    •    call CHR to check in at least once a day by 10:00 a.m.
•    inform CHR within 30 minutes of arrival at and department from the receiver
13    •    pick-up at 13:30 on December 8, 2016, and deliver at 6:30 on December 9, 2016
•    deliver on time or CHR will impose financial penalties
14    •    report any change to pick up and deliver parameters to CHR
•    call CHR for any problems after regular business hours or over the weekend
15    •    follow specific driving directions from the shipper to the receiver.[141]

16

17    The Costco Agreement provides that CHR shall:
•    have "sole and exclusive control" over and "responsibility" for the carriers and
drivers providing transportation services under the contract
18    •    transmit all payments to the carriers
•    assume the same liability as that of a common carrier for damage or loss of the load
19    •    pay for any damage or loss to freight while in transit
•    maintain a cargo liability insurance policy
20    •    maintain umbrella coverage for comprehensive general liability, automobile
liability and collision insurance, and employers' liability insurance
21    •    maintain comprehensive automobile and collision insurance covering all owned,
hired, and otherwise operated non-owned vehicles
22    •    list Costco as an additional insured on these insurance policies.[142]

23

24    [139] *Mansoor v. Am. Med. Sys., Inc.,* No. 208CV01117RCJLRL, 2009 WL 10693229, at *3 (D. Nev. Sept.
18, 2009) (denying summary judgment on vicarious liability).

25    [140] CHR-RT Service Master Broker-Carrier Contract at ¶¶ 3, 4, 13, and 17. **Ex. K.**

26    [141] Contract Addendum and Load Confirmation at 1-3. **Ex. H.**

27    [142] Costco Agreement at ¶¶ 2(D), 6, 8, 10. **Ex. O**; *see* Fed. R. Evid. 411 (insurance is admissible for "proving
agency, ownership, or control).

28

CHR could track the Load in real-time and at all times to establish Mr. Singh's precise GPS location.[143] In addition, one of the agency factors is the extent the employee or agent's activities further the general business concerns of the alleged employer or principal. RT Service's work (hauling freight from one location to another) is closely aligned with CHR's business of transportation services and third-party logistics, which consists of handling the means and methods of hauling freight for its customers. Costco is CHR's customer, not RT Service's. Costco hired CHR "for the transportation of Costco []'s . . .Commodities," not RT Service.[144] That business necessarily requires the service of semi-tractors and drivers. The work RT Service performs is not unique; it is directly related to, if not the same as, the freight transportation business conducted by CHR.

The provision of necessary tools or materials also is an important consideration. CHR paid for RT Service's fuel for the Load in advance of the trip.[145] Diesel fuel is a necessary material for cross-country freight transportation services.

As set forth above, CHR could terminate RT Service if it violated any terms of the master agreement or Contract Addendum and Load Confirmation. CHR handled all money and payments for the transaction to RT Service. And CHR set RT Service's start and end times and route for the load.

On very similar facts as here, in jurisdictions with nearly identical standards for vicarious liability as Nevada, federal district courts send the issue—whether a broker is vicariously liable for the motor carrier and the driver's negligence—to the jury. For example, in *Ying Ye v. Global Sunrise, Inc.*, the court also held that there was a jury question on the agency claim.[146] The court concluded that the following facts were sufficient to raise an inference of "right to control":

---

[143] Ronel Sing Dep. Tr. at 410:2-5 (tracking via MacroPoint) **Ex. G**; CHR (Bruce Johnson) Rule 30(b)(6) Dep. Tr. 21:5-19 (MacroPoint "is one of those communications tools that [CHR] has engaged . . .to do business with where they have a mobile communication tracking system"). **Ex. A.**

[144] Costco Agreement at 1 (first sentence). **Ex. O.**

[145] Ronel Singh Dep. Tr. at 315: 7-10 and 363:11-18. **Ex. G.**

[146] *Ying Ye v Glob. Sunrise, Inc*, 2020 WL 1042047, at *5 (N.D. Ill. Mar. 4, 2020).

> [The broker] communicated directly with [the carrier] about the load, required that [driver] call it to be dispatched, required the use of a specific trailer, and required communications at multiple points in the transport of the load as well as daily tracking updates and location reports.[147]

There is credible evidence of almost all of these facts, in addition to many others, evidencing CHR's right to control here.

CHR also was the broker in *Riley v AK Logistics, Inc*. The *Riley* contract addendum and load confirmation is substantially similar to the Contract Addendum and Load Confirmation here.[148] In favor of finding an agency relationship, the *Riley* court noted that the contract addendum authorized CHR to exercise significant control over the carrier's delivery of the load— "it required frequent updates as to the status of the delivery, provided specific pick-up and delivery windows, and set forth turn-by-turn directions [for the trip]"—and "without motor carriers [ ], [CHR] would not be in business, as such the [defendant carrier's] work is indisputably part of the regular business of [CHR]."[149] But the court also noted facts not supporting agency, including that the carrier "was hired to complete specific deliveries and was paid by the delivery" and the contract between CHR and the carrier provided that the parties "did not intend to create an agency relationship."[150] Under these facts—which are nearly identical to the facts at issue here—the *Riley* court denied summary judgment on the vicarious liability issue:

> The Court does not believe that the existence of an independent contractor relationship is the only reasonable conclusion that can be drawn from the record before it. *** Rather, the Court believes there remains a genuine dispute on the issue of the extent to which [CHR] had the right to control the details of [the carrier's]' delivery of the load. Under these facts, the question of whether an agency relationship existed between CHR and [the carrier] at the time of the collision, such that [CHR] can be held vicariously liable ***, must be determined by a jury.[151]

---

[147] *Id.*

[148] *Riley*, 2017 WL 2501138 at *7.

[149] *Id.*

[150] *Id.*

[151] *Id.* at 8.

29

As set forth above, CHR did not satisfy its initial burden of showing the absence of a genuine issue of material fact about the theory of vicarious liability. Accordingly, the Court should not grant summary judgment on the issue. But even if CHR had satisfied its initial burden, more than sufficient, credible evidence raises a genuine issue of material fact about vicarious liability.

In *Volkova v. CHR*—the first case adopting the minority view that the Federal Aviation Administration Authorization Act (the "FAAAA") preempts negligent hiring claims against brokers for personal injuries[152]—the parties went to trial only on the vicarious liability claim against CHR. A jury rendered a compensatory-damages verdict of $16.5 million against CHR solely for vicarious liability.[153] Denying CHR's motion to vacate the jury's verdict, the court stated:

> I think that this judgment that was entered by the jury, even though it's fact-specific, carries some importance. I think it sends a message to the transportation industry, certainly sends a message to brokers, such as [CHR], and I think it has some effect and weight that way, and it may very well affect a change in some things. So, I think the public interest is against [the motion to vacate].[154]

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court enter an order denying Defendant CHR's Motion for Summary Judgment.

Dated: July 29, 2021

/s/ Rena Mara Leizerman
Michael Jay Leizerman *(Pro Hac Vice)*
Rena Mara Leizerman *(Pro Hac Vice)*
The Law Firm For Truck Safety, LLP
3450 W. Central Avenue, Suite 328
Toledo, OH 43606
Phone: (800) 628-4500
Facsimile: (888) 838-8828
michael@truckaccidents.com
rena@truckaccidents.com

Matthew L. Sharp
Nevada State Bar 4746
Matthew L. Sharp, Ltd
432 Ridge Street
Reno, NV 89501
Phone: (775) 324-1500
Facsimile: (775) 284-0675
matt@mattsharplaw.com

*Attorneys for Plaintiff Allen M. Miller*

---

[152] *Volkova v. CHR*, 2018 WL 741441, at *4 (N.D. Ill. Feb. 7, 2018).

[153] 2019 WL 2436903 and 2019 WL 4461714 (N.D. Ill. May 16, 2019). After trial, the parties settled for approximately $15 million; the *Volkova* plaintiff did not appeal the FAAAA ruling to the Seventh Circuit.

[154] *Volkova v. CHR*, Hr. Tr. 4:11-17 (Jul. 25, 2019). **Ex. T.**

30

**CERTIFICATE OF SERVICE**

Under FRCP 5(b), I certify that on July 29, 2021, I directed the electronic filing of the foregoing with the Clerk of the Court with the electronic filing system which served the following individuals electronically:

Michael E. Sullivan
Michael A. Burke
Robison, Simons, Sharp & Brust
71 Washington Street
Reno, NV 89503
msullivan@rssblaw.com
mburke@rssblaw.com
*Attorneys for Defendant C.H. Robinson Worldwide, Inc.*


/s/ Rena Mara Leizerman
Rena Mara Leizerman

31